**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA                                    CRIMINAL ACTION

VERSUS                                                                      20-76-SDD-SDJ

BENJAMIN ANTHONY FIELDS

## RULING

This matter is before the Court on the *Motion to Suppress*[1] filed by the Defendant, Benjamin Anthony Fields ("Fields"). The United States ("the Government") filed an *Opposition*[2] to this motion. The Court ordered Fields to file a supplemental brief, which he did.[3] The Government then filed a *Reply* to that brief.[4] The Court held an evidentiary hearing on this *Motion* on June 14, 2021 and took the matter under advisement.[5] The Court has considered the arguments of the Parties, the testimony and evidence presented at the hearing, and the law as applied to the facts of this case.  For the reasons set forth below, Fields's *Motion*[6] shall be granted.

## I.    FACTUAL BACKGROUND

The Court finds that the Parties proved the following facts by a preponderance of the evidence. These facts are derived from testimony produced at the hearing and body camera footage in evidence that captured the events at issue.

---

[1] Rec. Doc. No. 26.
[2] Rec. Doc. No. 39.
[3] Rec. Doc. No. 60.
[4] Rec. Doc. No. 62.
[5] Rec. Doc. No. 64.
[6] Rec. Doc. No. 26.

On September 17, 2020, Corporal Joshua Barnett ("Cpl. Barnett") of the Baton Rouge Police Department ("BRPD") Street Crimes Unit was on patrol when he saw a white Mercedes ("the Mercedes") parked in the driveway of 4028 Chippewa Street ("4028 Chippewa"). The house had several "no trespassing" signs posted on it. Two people were in the Mercedes, including Fields, who was in the passenger seat, and Marvin Batiste ("Batiste"), who was in the driver's seat. Coda Stovall ("Stovall") was standing next to the vehicle on the passenger side. Cognizant of the complaints BRPD had received about people using abandoned houses for nefarious purposes, and in keeping with the Street Crimes Unit standard operating procedure, Cpl. Barnett made the block and radioed for backup.

Shortly thereafter, Cpl. Barnett and three other BRPD officers descended on 4028 Chippewa in two police vehicles, partially blocking the Mercedes in the driveway. Cpl. Barnett's body camera shows him exit his vehicle and, within twenty seconds of his exit, he and the other officers surrounded the Mercedes. Cpl. Barnett's body camera shows that, as Cpl. Barnett approached, Fields opened the front passenger door as another officer stood a few feet from the Mercedes. Cpl. Barnett and another officer positioned themselves on the passenger side of the Mercedes. Two other officers positioned themselves on the driver's side.

The officers asked Stovall, Fields, and Batiste what they were doing on the property. An officer asked Batiste when he had last smoked marijuana, and the officers informed Stovall, Fields, and Batiste that they could smell marijuana. The Parties dispute when the officers first smelled marijuana. Within two minutes of the officers arriving at 4028 Chippewa, Stovall was placed in a police car, and the officers ordered Fields and

Batiste out of the Mercedes; they too were handcuffed and led away. Fields was placed in a police car while the officers searched the Mercedes.[7] Their search turned up a small empty bag that had contained marijuana, some marijuana infused gummies, as well as some loose unidentified pills.[8] Within minutes, three more police cars carrying six more police officers arrived on the scene.

Six minutes after arresting the three men, including Fields, Cpl. Barnett walked from the Mercedes twenty feet up the driveway toward the house. On the side of the house, there was a narrow pathway hemmed in on the left by the house and on the right by an adjacent chain link fence. Cpl. Barnett walked along that path, periodically shining a flashlight under the house to search for contraband. Near the rear of the house, Cpl. Barnett observed, with the aid of his flashlight, a firearm under the house. Further investigation yielded two more firearms next to the first one. Fields now seeks to suppress those firearms.

## II.    LAW AND ANALYSIS

Fields challenges the constitutionality of a warrantless search and seizure, so the Government bears the burden of demonstrating the constitutionality of the search and seizure.[9] Although the Government argues that Fields lacks Fourth Amendment standing to contest the search under the house because he had no reasonable expectation of privacy as to the house, the Court finds that it need not reach the Fourth Amendment standing issue as to the house. The Court concludes that the officers seized Fields before they had reasonable suspicion that a crime had been or was about to be committed, so

---

[7] It is unclear whether Batiste and Stovall were also placed in police cars.
[8] No evidence was introduced as to whether the pills were legally possessed.
[9] *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

regardless of Fields's Fourth Amendment standing to challenge the search of the house, the firearms must be suppressed as the fruit of the unconstitutional seizure of Fields.

### A.  The Fourth Amendment, Generally

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[ ] against unreasonable searches and seizures."[10] "Few protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures."[11] [E]vidence obtained through an unreasonable search or seizure may be suppressed."[12]

### B.  Fourth Amendment Standing

The protections of the Fourth Amendment are personal in nature. Therefore, a defendant seeking suppression must show that "'his *own* fourth Amendment rights were infringed by the search [or] seizure which he seeks to challenge.'"[13] Although termed "standing," Fourth Amendment "standing" "is not a jurisdictional question," rather it requires that the defendant seeking suppression show that the alleged unreasonable search or seizure "infringed a Fourth Amendment interest of the defendant himself.[14]

While the Parties devoted substantial time to addressing whether Fields has Fourth Amendment standing to challenge the search under the house, the Court finds that it need not reach that issue because the seizure of Fields was unconstitutional, and the firearms must be suppressed as fruit of the unconstitutional seizure.

---

[10] U.S. Const. amend. IV.
[11] *Byrd v. United States*, 138 S. Ct. 1518, 1526, 200 L. Ed. 2d 805 (2018).
[12] *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (quoting *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).
[13] *Id*. (quoting *Byrd v. United States*, 138 S. Ct. 1518, 1526, 200 L. Ed. 2d 805 (2018)) (alteration in original).
[14] *Id*. (internal quotations and citations omitted).

## C. The Seizure of Fields

Because the search under the house that recovered the firearms was incident to Fields's seizure, the first step in the analysis is to determine whether the seizure of Fields was constitutional. The seminal question is whether officers had reasonable suspicion to believe that a crime was being committed or was about to be committed before seizing Fields. The detaining officer must point to "specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the seizure" to establish reasonable suspicion.[15]

At what point was Fields seized? It is settled law that a traffic stop constitutes a seizure of the driver and passenger.[16] A police officer's diversion of a motorist from the flow of traffic to the shoulder of the road necessarily constitutes a restriction on the motorist's freedom of movement. In the instant case, however, the police officers seized the Mercedes and its occupants as it sat parked in a driveway. As such, the Court will analyze the seizure of Fields under the traditional test for a seizure, with due consideration given to the fact that Fields was in the passenger seat of a vehicle parked on private property.

The line between a voluntary encounter with police and a seizure is hazy:

> Not all encounters between law enforcement officers and citizens are seizures for purposes of the Fourth Amendment. A voluntary encounter between an officer and a citizen may ripen into a seizure, triggering the Fourth Amendment and requiring officers to be able to articulate reasonable suspicion or probable cause, only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen…. The test provides that an individual has been seized for Fourth Amendment purposes only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free

---

[15] *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010), opinion modified on denial of reh'g, 622 F.3d 383 (5th Cir. 2010) (internal quotations and citations omitted).
[16] *Brendlin v. California*, 551 U.S. 249, 255 (2007).

to leave. This reasonable person standard is objective and is concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person.[17]

"The test for whether a seizure occurred is necessarily imprecise because it seeks to measure the coercive effect of police conduct when viewed as a whole."[18] "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."[19] The Court should "eschew[] focusing on the particular details of that conduct in isolation,"[20] and instead look at the "totality of the circumstances."[21] "[B]locking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive significance."[22] The Government bears the burden of proving that an encounter was consensual rather than coercive.[23]

The Court finds that Fields was seized almost immediately once the police arrived. The Court's charge is to determine when a reasonable person would have felt that they were not free to leave had that hypothetical reasonable person been in Fields's position. A reasonable person sitting in the passenger seat of the Mercedes would have seen two police cars pull up in front of the vehicle, partially blocking the vehicle in the driveway.

---

[17] *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (internal citations omitted and alterations in original).
[18] *Id*. (citing *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L.Ed. 2d 565 (1988)).
[19] *Chesternut*, 486 U.S. at 573–74.
[20] *Mask*, 330 F.3d at 337.
[21] *United States v. Drayton*, 536 U.S. 194, 204, 122 S. Ct. 2105, 153 L.Ed. 2d 242 (2002)).
[22] *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. 1982) (analyzing seizure in the context of an officer stopping someone in an airport); see also *Keller v. Fleming*, 952 F.3d 216, 223 (5th Cir. 2020) (applying *Berry* in the context of an officer stopping someone walking along the road).
[23] *United States v. Carroll*, No. CR 18-13-JWD-RLB, 2018 WL 6576408, at *8 (M.D. La. Dec. 13, 2018), *aff'd*, 812 F. App'x 255 (5th Cir. 2020).

Next, a reasonable person sitting in the passenger seat of the Mercedes would have watched two officers approach the driver's side of the Mercedes, while another two officers approached the passenger side.[24] A reasonable person would have observed that officers did not approach the other men who appeared to be working on the property, only the three men who were in or standing near the Mercedes that was parked in the driveway.  As the officers approached the vehicle, Fields opened the passenger door, and the officer walking in front of Cpl. Barnett positioned herself in the passenger doorway in front of Fields. Notably, that officer did not testify. Although the officers approached casually and did not draw their weapons, they effectively surrounded the vehicle and blocked Fields's path of egress from the vehicle. Even in the absence of drawn weapons or verbal commands, the officers' actions were clearly a show of authority such that a reasonable person would not have felt that they were free to leave once the officer positioned herself in front of Fields as he was opening the passenger door.[25]

The question is whether the officers had reasonable suspicion of criminal activity before seizing Fields. The detaining officer must point to "specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the seizure" to establish reasonable suspicion.[26] The Court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized

---

[24] *United States v. Pena-Cantu*, 639 F.2d 1228, 1229 (5th Cir. 1981).

[25] *Id*. ("Applying this objective standard to the facts of this case, we conclude that a reasonable driver would not feel free to ignore a situation in which several agents pull up directly behind his stationary car, position themselves on both the driver and passenger sides of the vehicle, and proceed to question him while he and his passengers remain within the confines of the car. Since the agents clearly manifested an intention to cabin appellant within his car until he identified himself, an investigatory seizure occurred before the agents discovered the illegal status of his compatriots.").

[26] *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010), opinion modified on denial of reh'g, 622 F.3d 383 (5th Cir. 2010) (internal quotations and citations omitted).

and objective basis for suspecting legal wrongdoing."[27] While evaluating whether the officer's suspicion is reasonable, the Court must give "due weight…to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience."[28] "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."[29] Notably, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[30]The Government bears the burden of pointing to specific and articulable facts warranting reasonable suspicion that Fields committed or was committing or about to commit a criminal act.[31]

The Government argues that Cpl. Barnett had reasonable suspicion that Fields, or more accurately the occupants of the Mercedes, were trespassing and that Cpl. Barnett developed reasonable suspicion of possession of marijuana as he approached the vehicle. The Government argues that the officers had reasonable suspicion that the occupants of the Mercedes were trespassing because they had received general complaints about people using abandoned houses for nefarious purposes and the house had "no trespassing" signs.[32] Cpl. Barnett's testimony corroborated these assertions. However, Cpl. Barnett conceded he had not personally received any complaints about

---

[27] *Id*. (internal citations omitted).
[28] *Id*. (internal citations omitted).
[29] *Id*.
[30] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).
[31] *United States v. Monsivais*, 848 F.3d 353, 363 (5th Cir. 2017).
[32] Rec. Doc. No. 39, p. 9.

67941

4028 Chippewa on that particular day[33] and that many houses in the area had "no trespassing" signs.[34] Cpl. Barnett's knowledge is critical because he is the officer who initiated the sequence of events that led to the seizure. On cross examination, while defense counsel was asking Cpl. Barnett about the first time he drove by the house, defense counsel asked Cpl. Barnett, "[t]hey [the occupants of the Mercedes] weren't doing anything that you saw that was criminal?" and he responded "not at the time, no sir."[35] And in response to the question, "You had no reason to believe that these three gentlemen were trespassing at this residence other than they were young black men, right?", Cpl. Barnett responded, "[g]oing off the signs, I was just there to investigate the situation."[36] He also testified on cross examination that he believed the house was abandoned because BRPD often received complaints about people hanging out at the house, but on redirect he stated that he believed the property was abandoned because he never saw anyone at the house and there were "no trespassing signs" posted.[37]

The Fifth Circuit considered a similar fact pattern in *United States v. Hill*.[38] At 11:00 p.m. on a Saturday night, the defendant, Hill, was sitting in the driver's seat of a parked car in an apartment complex that had a "drug reputation" and was in a high crime county.[39] When the police arrived, the passenger got out of the vehicle and took a few steps away.[40] "The officers came across this scene while they were driving through the county as 'just

---

[33] Hearing Transcript, Rec. Doc. No. 77, p. 75. Additionally, on cross examination in response to the question, "[s]o there was no information regarding 4028 Chippewa Street that y'all were responding to?" Sergeant Kennedy testified, "[n]ot directly, no." *Id*. at 40.
[34] *Id*. at p. 77.
[35] *Id*. at p. 64.
[36] *Id*. at p. 69.
[37] *Id*. at p. 74, 78.
[38] 752 F.3d 1029 (5th Cir. 2014).
[39] *Id*. at 1034.
[40] *Id*.

kind of a roving patrol[,]' and they had no specific reason to suspect any particular criminal activity at the apartment complex where they saw Hill's parked car."[41] "Only a matter of seconds elapsed between the officers' seeing Hill's car and [the officers'] seizure and frisk of Hill."[42]

The court held that the Government had not established reasonable suspicion. The court noted that at the time the officers arrived, all they saw were two people parked in the lot of an apartment building on a weekend night.[43] "Hill and his passenger were not 'offending any traffic ordinance; there was no evidence of recent crimes in the neighborhood, no reason to suspect that [Hill] or his passenger were wanted by the police, and no other reason to believe that anything unusual was taking place.'"[44]

The court also noted what the Government had not shown, citing as relevant that when the officers approached the apartment complex: "they were not responding to any report of criminal activity nor did they have any particular reason to think that crime was happening there at the moment of their arrival," and they were not responding to a tip about a particular suspect.[45] Moreover, "this [was not] a case where the police came across a person, had a hunch that something could be amiss, and then observed the suspect for sufficient time to determine criminal activity indeed reasonably appeared to be afoot."[46] Further, Hill had not made any suspicious movements.[47]

---

[41] *Id*.
[42] *Id*.
[43] *Id*.
[44] *Id*. (quoting *United States. v. Beck*, 602 F.2d 726, 729 (5th Cir. 1979)).
[45] *Id*.
[46] *Id*.
[47] *Id*.

In *Hill,* the Government relied heavily on its assertion that the arrest was made in a high crime area.[48] Although the court noted that this fact was a "relevant consideration," it held that "incantations" about high crime areas are insufficient to create reasonable suspicion.[49] This was despite the court finding that the apartment complex had a "reputation for drugs."[50]

The Court finds that the officers in the instant case lacked particularized reasonable suspicion of trespassing when they seized Fields. The officers had no complaints or tips about criminal activity at 4028 Chippewa on that day.[51] Moreover, as the officers approached the Mercedes, three men were cleaning the yard and removing debris. When officers asked Stovall whose house it was, he indicated that the house belonged to one of the men working in the yard, but the officers did not question any of those men to see if one of them was the owner and if Fields and the other two men in the Mercedes had permission to be there. The officers' professed suspicion of trespassing is therefore implausible under these circumstances.

BRPD had received complaints about people trespassing at 4028 Chippewa in the past, and Cpl. Barnett had a subjective belief that the property was abandoned. But this belief was unreasonable in light of the yard cleaning and debris removal that was taking place at the time. The past complaints about trespassing generally were not particularized to that day or that vehicle, and generalized complaints about trespassing in the area in the past are analogous to the "incantations" of "high crime area" in *Hill* which did not rise to the level of particularity necessary to justify a seizure. Other than their mere presence,

---

[48] *Id*. at 1035.
[49] *Id*.
[50] *Id*.
[51] Hearing Transcript, Rec. Doc. No. 77, p. 40, 75.

there was simply nothing to suggest that Fields, and the other of the occupants of the Mercedes, were trespassing. On these facts, there was no particularized information or evidence that suggested that the occupants of the Mercedes were trespassing.

The foregoing is not to suggest that the officers could not approach the vehicle and ask the occupants what they were doing there. Indeed, Cpl. Barnett testified that this was his intention and that type of voluntary encounter with the police would not implicate the Fourth Amendment until the police seized the suspect.[52] But in the instant case, Fields was seized immediately; the officers exercised too much authority, too soon. Therefore, the Court's finding does not hamstring officers' investigatory techniques in future encounters.

The Government also argues that Cpl. Barnett smelled marijuana which gave him reasonable suspicion to seize Fields. An officer's detection of the odor of illicit drugs creates probable cause, and therefore, reasonable suspicion.[53] The analysis turns entirely on when Cpl. Barnett smelled marijuana. The Court has already concluded that Fields was seized when he opened the passenger door of the Mercedes and an officer positioned herself in front of him in the doorway. Cpl. Barnett must have had a reasonable suspicion of marijuana possession prior to that time, meaning that he must have smelled marijuana prior to that time.

Cpl. Barnett testified on direct that he first smelled marijuana as Fields opened the passenger door of the Mercedes as Cpl. Barnett was approaching the vehicle.[54] However, Cpl. Barnett conceded on cross examination that in his narrative report of the arrest, he

---

[52] *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014).
[53] *United States v. Newton*, 463 F. App'x 462, 466 (5th Cir. 2012).
[54]  Hearing Transcript, Rec. Doc. No. 77, p. 53.

wrote that he first smelled the marijuana "while conversing" with Stovall at the back of the vehicle.[55] On cross examination, Cpl. Barnett reaffirmed his position, testifying that he first smelled marijuana "as [he] was talking to [Stovall]."[56] The body camera footage clearly shows that Cpl. Barnett began speaking with Stovall *after* Fields was seized.

In the face of this conflicting testimony, the Court credits the near-contemporaneous narrative report Cpl. Barnett authored and his testimony affirming its veracity which is corroborated by the body camera footage. The narrative report is far less likely to be a post hoc rationalization given its temporal proximity to the day in question. Moreover, its contents were tested, and affirmed, through the crucible of cross examination. Cpl. Barnett's testimony on direct, on the other hand, is self-serving.

Therefore, since Fields was seized before Cpl. Barnett began talking to Stovall, Fields was seized before Cpl. Barnett developed reasonable suspicion of marijuana possession. The Court acknowledges that the timing is extremely close, but the body camera footage allows the Court to determine precisely when Fields was seized and when Cpl. Barnett began conversing with Stovall and first detected an odor of marijuana. Additionally, even if the seizure and inception of reasonable suspicion were simultaneous, the Government could not carry its burden. Reasonable suspicion must come before the seizure since reasonable suspicion is a prerequisite to a constitutional seizure. The Court holds that Fields was unconstitutionally seized in violation of the Fourth Amendment.

At this point in the analysis, the question before the Court is: regardless of whether Fields has standing to contest the search under the house that located the firearms, can

---

[55] *Id*. at p. 66.
[56] *Id*. at p. 67.

he nonetheless seek to suppress the firearms? An errant view of Fourth Amendment standing may suggest no, however, the Court finds in the affirmative.

As explained above, Fourth Amendment standing is not jurisdictional. It is part of a defendant's substantive case when he seeks to challenge a search or seizure. Therefore, regardless of whether Fields has standing to contest the *search* that discovered the firearms, he may nonetheless attempt to suppress the firearms by other means. Courts have held, and the treatise writers agree, that a passenger in a vehicle has Fourth Amendment standing to contest his seizure and seek suppression of the fruits of a subsequent search of the vehicle.[57] This result is consistent with the fruits of the poisonous tree doctrine, which generally extends the exclusionary rule to exclude evidence derived from other evidence (or a seizure) obtained through violation of the Fourth Amendment. The *Brendlin* Court, while not explicitly holding that an unconstitutionally seized passenger in a vehicle can challenge evidence discovered in a subsequent search of that vehicle as a fruit, ruled that passengers are considered seized when a vehicle is stopped by the police:

> [T]he consequence to worry about would not flow from our conclusion, but from the rule that almost all courts have rejected. Holding that the passenger in a private car is not (without more) seized in a traffic stop would invite police officers to stop cars with passengers regardless of probable cause or reasonable suspicion of anything illegal. *The fact that evidence uncovered as a result of an arbitrary traffic stop would still be admissible against any passengers would be a powerful incentive to run the kind of 'roving patrols' that would still violate the driver's Fourth Amendment right.*[58]

---

[57] *United States v. McQuagge*, 787 F. Supp 637, 652 (E.D. Tex. 1991), *aff'd sub nom. United States v. Mallory*, 8 F.3d 23 (5th Cir. 1993); *United States v Portillo-Saravia*, 379 F. Supp 3d 600, 611 (S.D. Tex. 2019); 6 W. Lahave, § 11.4(d) Search as fruit of prior illegal arrest or detention, 6 Search & Seizure § 11.4(d) (6th ed.).

[58] *Brendlin v. California*, 551 U.S. 249, 263, 127 S. Ct. 2400, 2410, 168 L. Ed. 2d 132 (2007) (emphasis added).

A passenger, therefore, enjoys the same constitutional protections as the driver, and the remedy for the violation of the constitutional rights of a passenger are likewise the same. In *Brendlin*, the Supreme Court cited with approval a parenthetical quote from a treatise which stated, "'[i]f either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit.'"[59] The Court finds that Fields has standing to seek to suppress evidence derived from his unconstitutional seizure.[60] This evidence potentially includes the firearms found under the house, and the fact that they were not found in the Mercedes goes to the attenuation factor of the fruit of the poisonous tree analysis.

### D.  Fruit of the Poisonous Tree

"[T]he exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'"[61] But "evidence should not be excluded merely because it would not have been discovered 'but-for' a constitutional violation."[62] Relevant here is the attenuation doctrine:

> The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence. Evidence may be sufficiently attenuated from the Fourth Amendment violation even where the violation is a but-for cause of the discovery of the evidence. The key question is whether the evidence has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the

---

[59] *Brendlin*, 551 U.S. at 259 (quoting 6 W. LaFave, Search and Seizure § 11.3(e), pp. 194, 195, and n. 277 (4th ed.2004 and Supp.2007)).

[60] *United States v. Olivares-Rangel*, 458 F.3d 1104, 1118 (10th Cir. 2006) (it is not the case that "the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding both the violation which constitutes the poisonous tree and separate standing regarding the evidence which constitutes the fruit of that poisonous tree.").

[61] *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012) (quoting *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001).

[62] *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

primary taint. The relevant factors to determine attenuation will depend on the type of evidence challenged and official misconduct alleged.[63]

"The notion of the dissipation of the taint attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost."[64] As summarized by commentators, "the underlying purpose of the 'attenuated connection' test is to mark 'the point of diminishing returns on the deterrence principle.'"[65]

Courts consider three factors when determining whether the attenuation doctrine applies: (1) the "'temporal proximity' between the unconstitutional conduct and the discovery of the evidence…"; (2) "'the presence of intervening circumstances'"; and (3) "'the purpose and flagrancy of the official misconduct.'"[66] As to the first factor, "[Supreme Court] precedents have declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained."[67] The third factor takes into consideration that the purpose of the exclusionary rule is to deter flagrant police misconduct.[68]

Based on the body camera footage, the temporal proximity is close, since the firearms were discovered within nine minutes of the seizure. This weighs against attenuation since a "substantial time" did not elapse.[69]

---

[63] *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) (internal citations and quotations omitted).
[64] *Brown v. Illinois*, 422 U.S. 590, 609, 95 S. Ct. 2254, 2264, 45 L. Ed. 2d 416 (1975) (Powell, J. concurring).
[65] 6 W. LaFave, § 11.4(a)Extent of the taint: "but for"; "attenuated connection"; "independent source"; and "inevitable discovery", 6 Search & Seizure § 11.4(a) (6th ed.) (quoting Amsterdam, 112 U. Pa. L. Rev. 378, 390 (1964).
[66] *Utah v Strieff*, 579 U.S ____ (2016), 136 S.Ct. 2056, 2061. (quoting *Brown v. Illinois*, 422 U.S. 590 (1975)).
[67] *Id*. at 2062.
[68] *Id*. at 2063.
[69] *Id*. at 2062.

The intervening circumstances factor requires more in-depth analysis. In between the seizure of Fields and the discovery of the firearms was the search of the Mercedes, which uncovered an empty bag that previously had marijuana in it, as well as marijuana gummies and some loose pills. This intervening circumstance may break the causal chain between the seizure and discovery of the firearms if it gave the officers a justifiable reason to search further. *Utah v. Strieff* is a recent Supreme Court case that considered the intervening circumstances factor.

In *Strieff*, the defendant had been unconstitutionally seized.[70] After the seizure, the arresting officer relayed Strieff's information to a police dispatcher, who informed the officer that Strieff had an outstanding arrest warrant.[71] The officer arrested Strieff and discovered methamphetamine on his person in a search incident to that arrest.[72] Strieff moved to suppress the methamphetamine as the fruit of the poisonous tree of the arrest.[73]

The Court reversed the Utah supreme court, holding that the discovery and execution of a valid preexisting warrant was sufficiently attenuated to dissipate the taint.[74] The Court also noted that the officer had an obligation to arrest Strieff once he discovered a warrant, thus "[the officer's] arrest of Strieff…was a ministerial act that was independently compelled by the pre-existing warrant."[75] The search incident to that arrest was therefore sufficiently attenuated from the unconstitutional seizure.

In this case, the seizure of Fields led directly to the search of the Mercedes which yielded an empty baggie that had contained marijuana, marijuana gummies, unidentified

---

[70] *Id*. at 2060.
[71] *Id*.
[72] *Id*.
[73] *Id*.
[74] *Id*.
[75] *Id*. at 2063.

67941

pills, and, upon searching Batiste's person, a small baggie that contained marijuana. Unlike the outstanding warrant in *Strieff* that compelled the officer to arrest Strieff, the contraband recovered from the Mercedes did not compel the search of the perimeter. Moreover, Cpl. Barnett's search of the perimeter was not necessary to search for evidence of the crimes that Cpl. Barnett testified he suspected the occupants of the Mercedes were committing (trespassing and marijuana possession). The officers could have found evidence of trespassing only by determining whether the occupants of the Mercedes had permission to be on the property by asking the owner of the property. And the officers had already found marijuana in the Mercedes which is the only evidence that could corroborate their suspicions that the occupants of the Mercedes possessed marijuana. Rather, the Court finds that, based on Cpl. Barnett's testimony and other facts adduced at the hearing, Cpl. Barnett's search of the perimeter of the house was based solely on the identity of the person seized—Fields—and not on the contraband found in the Mercedes.

On direct examination, in response to the question, "[w]hy did you walk back [by the side of the house]?", Cpl. Barnett responded, "We were searching the perimeter, being as that we passed the first time, to make sure that nothing was placed, when they seen us, due to the fact that [in] our previous dealings with this subject and others, when we've always came into contact with him, he's always had firearms or something in his possession of that sort."[76]  Additionally, on cross examination, defense counsel asked Cpl. Barnett what he meant when, after discovering the firearms, he told another officer "I knew it, I told you." Cpl. Barnett responded, "Referring to, like in my previous statement

---

[76] Hearing Transcript, Rec. Doc. No. 77, p. 57–58.

I stated that every time we've contacted him and subjects he's affiliated with, they've always been in possession of firearms or certain things." Defense counsel followed up with the question, "So based on your hunch from knowing Mr. Fields in the past, that's what you're meaning by saying I knew it, I told you." Cpl. Barnett responded, "[i]n a way, yes, sir."[77] Therefore, on both direct and cross examination, Cpl. Barnett confirmed that he searched under the house because of the identity of the person seized, Fields.

The Court finds that there was no intervening circumstance in this case. Cpl. Barnett draws a direct causal nexus between the identity of Fields and the decision to search near the house. His testimony in no way indicates that the fruits of the search of the car led him to search near the house. On the contrary, he indicated that because the officers did not find firearms in the vehicle, and "they," referring to BRPD collectively, knew Fields to "always" be in possession of firearms, he searched near the house to locate said firearms. In other words, what he did not find in the vehicle led him to search further, which indicates the search of the vehicle and search of the car were one continuous search. The search under the house was not a consequence of the search of the car, but instead was a consequence of the seizure of Fields because the officers acted on their collective knowledge of his supposed characteristics. This factor, the absence of intervening circumstances, weighs in favor of suppression of the firearms.

The third factor, the purposes and flagrancy of the police misconduct, reflects the deterrent rationale of the exclusionary rule "by favoring exclusion only when the police misconduct is in most need of deterrence…"[78] The officers in this case made the error of

---

[77] *Id.* at p. 76.
[78] *Strieff*, 136 S. Ct. at 2063.

67941

leaping from a voluntary encounter with police to a seizure too quickly. The seizure was premised entirely on an unreasonable suspicion of trespassing. The officers acted on that suspicion by partially blocking the Mercedes in the driveway and surrounding it with four officers. Those actions were excessive given the suspected crime (trespassing), but they were not flagrantly unconstitutional.

The purpose of the attenuation analysis is to reach the bottom-line question: do the societal benefits of suppression outweigh its costs?[79] In other words, will suppression of the evidence in this case appreciably deter police misconduct? In this case, as in all exclusionary rule cases, the societal cost is that a potential criminal may escape just punishment. The societal benefit, on the other hand, is reinforcing the line between voluntary police interactions and the point at which an individual's liberties are restricted by a government actor. This line is particularly important because it delineates when a police officer's authority to compel may be exercised. In this case, where the officer's avowed intent was to investigate but not detain, the deterrent effect of suppressing the evidence outweighs the societal cost of the same, because suppression will motivate officers to remain cognizant of what is constitutionally required before they begin to compel obedience to their authority. Moreover, the societal costs are in part lessened because adherence to the dictates of the Fourth Amendment in this case, and in future cases like it, would merely have required the officers to attempt to investigate the situation before detaining Fields and the other occupants of the Mercedes. Therefore, the firearms discovered under the house are suppressed as a fruit of the unconstitutional seizure of Fields.

---

[79] *Davis v. United States*, 564 U.S. 229, 237, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011).

III.    **CONCLUSION**

For the reasons set forth above, Fields's *Motion to Suppress*[80] is GRANTED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>July 29, 2021</u>.


_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[80] Rec. Doc. No. 26.

67941